Kathleen PHILLIPS, Rebecca McGaffick and Edna Greeley, on behalf of themselves and all others similarly situated

Donna Mareno and Raymond Mareno, Intervenor Plaintiffs,

v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, a public corporation, Kenneth Reeher, individually and in his capacity as Executive Director of the Pennsylvania Higher Education Assistance Agency, and Charles H. Russell, individually and in his capacity as Assistant Deputy Director, Loans, Pennsylvania Higher Education Assistance Agency, Appellants.

No. 80–1919.

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 1981.

Decided July 27, 1981.

Rehearing and Rehearing In Banc Denied Sept. 3, 1981.

Robert W. Barton (argued), Killian & Gephart, Harrisburg, Pa., for appellants.

Edward A. Olds (argued), Neighborhood Legal Services Assn., Pittsburgh, Pa., for appellees.

Before ADAMS, ROSENN and HUNTER, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

Although loans for educational purposes on attractive terms are easily obtainable and often irresistible, repayment may be difficult and inconvenient. It is the inconvenience that is the genesis of this litigation. Plaintiffs, individual low-income residents of western Pennsylvania who had obtained loans guaranteed by the Pennsylvania Higher Education Assistance Agency ("PHEAA" or "Agency"), sought to enjoin PHEAA from suing them in Dauphin County, Pennsylvania, on the loans in default. They contend that by bringing suit in a forum as much as 200 miles from their homes, PHEAA had denied them the right of access to the courts, a violation of the fourteenth amendment of the United States Constitution. The United States District Court for the Western District of Pennsylvania agreed with plaintiffs' contention and enjoined PHEAA from instituting or further maintaining suits against the plaintiffs in Dauphin County. The district court also decided a pendent state claim and ordered PHEAA not to collect attorney's fees in actions on the loans, except where the collection of such fees is authorized in the loan agreement.[1] We reverse.

### I.

Kathleen Phillips, Rebecca McGaffick, and Edna Greeley initiated this class action on September 1, 1978, on behalf of themselves and all other similarly situated persons, against PHEAA and two of its officers, Kenneth Reeher, executive director, and Charles Russell, deputy director for loans. Donna and Raymond Mareno subsequently were permitted to intervene as plaintiffs. PHEAA, as guarantor of loans made to plaintiffs by commercial lending institutions,[2] had purchased these loans after default by paying the private institutions the full amount due on each loan. Phillips and McGaffick have been sued by PHEAA, which filed complaints in assumpsit against them in Dauphin County. The Agency has also taken legal action in Dauphin County against intervenors Donna and Raymond Mareno, but by entering a confession of judgment against them, rather than by filing a complaint in assumpsit. Greeley, not yet sued by PHEAA, has made no payments in a number of years and therefore anticipates such suit.

Plaintiffs purported to represent two classes of persons. Members of both classes share certain attributes. First, by definition, all are low-income[3] residents of Allegheny, Beaver, Butler or Lawrence Counties in the western part of Pennsylvania. Second, all members are stated to be borrowers of funds who have defaulted on their loans. The loans have been purchased by PHEAA, pursuant to its guaranty agreement with the lending institutions. The only distinction between the classes is based on the response of PHEAA to the defaults. Class I, represented by Phillips, McGaffick

1. The opinion of the district court is reported at 497 F.Supp. 712 (W.D.Pa.1980). This appeal is from the final judgment of the district court. 28 U.S.C. § 1291 (1976).

2. Plaintiff Phillips borrowed more than $2,500 under the PHEAA guaranty program in 1969 and 1970, but has never made any loan payments. Plaintiff McGaffick borrowed $1,000 and made payments reducing the principal to less than $600, but has not made a payment since 1972. Plaintiff Greeley borrowed money in 1975, part of which was returned to the lending institution after Greeley dropped out of school. More than $800 remained outstanding,

however. Greeley has never made a payment on her loan which was declared in default in 1976. Donna Mareno borrowed $2,650 in 1968 and apparently made some payments, but defaulted in 1970 and has made no payments since then on the outstanding principal of almost $2,000.

3. According to the district court, low-income persons are those "with incomes below 40% of the median income for Pennsylvania residents of similar family size." 497 F.Supp. at 719. This definition is not disputed on appeal.

and intervenors Mareno, is composed of persons, meeting the general requirements of class membership, who have already been sued by PHEAA in the Court of Common Pleas of Dauphin County. Class II, represented by Greeley, consists of persons, again having shared characteristics, who have not yet been, but allegedly *will be* sued by PHEAA in Dauphin County. The primary contention of both classes is that suit against them in Dauphin County, approximately 200 miles from their homes, deprives them because of their indigency of access to the courts and denies them due process.

To understand fully the issues in this case, it is necessary to examine briefly the primary operations of PHEAA. The United States encourages the individual states to establish higher education student-assistance programs by providing loan insurance and fiscal support. 20 U.S.C. §§ 1070–1089 (1976 & Supp. III 1979). Responding to this federal impetus, Pennsylvania created PHEAA to offer grants and low-interest loans to Pennsylvania residents, thereby enabling them to finance their higher education. Pa.Stat.Ann. tit. 24, §§ 5101–5189 (Purdon Supp. 1981). The PHEAA loan program is regulated, then, by both federal and state law. Under the legislation, PHEAA follows certain procedures in administering its loan program.

A person desiring a PHEAA-guaranteed low-interest loan first consults a lending institution, usually a bank. When the prospective borrower completes an application, which requires disclosure of both financial condition and the circumstances of the proposed educational venture, the institution forwards the forms to PHEAA offices in Harrisburg (Dauphin County) for administrative review. When PHEAA has determined the amount of the loan it will guarantee, it notifies both the lending institution and the applicant directly by mail. If the applicant decides to accept the offered loan, he or she signs a promissory note evidencing that indebtedness, the promise to repay and the Agency's address in Dauphin County. The lending institution then provides the funds to aid in payment of the student's educational costs. The borrower is not required to make any payments to the lending institution until nine months after his or her schooling has ended.

PHEAA initiates recovery measures only when the relationship between the lending institution, usually a bank, and the borrower has broken down because of the borrower's failure to repay. When a payment is missed, a borrower is declared in potential default and PHEAA is notified. If, after 120 days, the borrower has not caught up in payments, PHEAA is obligated to purchase the note from the bank for its full value and succeeds to all the rights of the bank. After PHEAA has taken over the note, it goes to great lengths amicably to induce payment. Unlike commercial lending institutions, PHEAA is willing and able to accept reduced payments and work out a plan for convenient repayment. Further, when a borrower is unable to make payments, PHEAA accepts the situation with the hope that the borrower's financial condition will improve and payments will resume. By mail and by telephone, PHEAA attempts to maintain an accurate picture of the delinquent's condition and to persuade those able to pay to do so; as to the unemployed and indigent, the Agency may literally wait for years before resorting to legal action.[4]

As a general rule, PHEAA takes no legal action for at least five years against indigent debtors who are unable to make payments. Indeed, the Agency maintains, and plaintiffs do not dispute, that it would continue indefinitely its policy of waiting for improvement on the financial condition of an indigent debtor were it not for its fear of the possible effect of the Pennsylvania statute of limitations.[5] PHEAA believes

---

4. For example, PHEAA claims that it has attempted to contact Phillips 13 times; McGaffick, 10 times; Mareno, 29 times; and Greeley, 3 times. When appropriate, deferments are granted. If a borrower is able, but unwilling to pay, the Agency may immediately take legal action.

5. Pennsylvania law provides:

that if it does not bring suit within six years after default or the last payment on the note, whichever is later, it may be barred from attempting to collect on the notes through legal action.[6] Thus, a person admittedly indigent for six years, and therefore both unable and unexpected to make payments, could not thereafter be required to repay PHEAA, even if indigency has been supplanted by prosperity. *See PHEAA v. Xed*, 102 Dauph. 304 (Pa.C.P. 1981).

To avoid such a situation, PHEAA adopted a policy of suing all debtors when five and one-half years had elapsed since default or the last payment, whichever was later. If the defendant in this state suit is indigent, PHEAA does not, while the indigency remains, further pursue collection of the debt. The mere filing of suit against such persons serves PHEAA's purpose of avoiding the running of the statute of limitations.

Under the policy, PHEAA has been filing a substantial number of suits—often several hundred per month. As a matter of convenience and administrative efficiency, and because the transaction giving rise to the agency's course of action occurred in Dauphin County, PHEAA has generally filed these suits in the state court of that county. Federal plaintiffs contend that this procedure, when directed against them,

is unconstitutional. Their complaint is directed at two specific elements of this procedure: (1) the decision *to file* suit and (2) the choice of Dauphin County as the forum. They do not dispute that PHEAA could properly sue them in court in plaintiffs' own counties. Although they have not challenged the matter of venue in the state courts, they contend that the simple act of PHEAA's filing suit—not the obtaining of a default judgment or the execution on property—in a forum 200 miles from their homes, unconstitutionally denies them access to the courts, as guaranteed by the fourteenth amendment. *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

## II.

Implicit in plaintiffs' complaint is an attack on Pennsylvania's Rules of Civil Procedure, for if state law did not permit PHEAA to sue these western Pennsylvania residents in Dauphin County, these alleged constitutional violations could never occur. Therefore, it is important to be cognizant of Pennsylvania's procedural rules insofar as they are relevant to these suits.

One type of action brought by PHEAA is a suit by summons in assumpsit, commenced by the filing of specified papers with the Prothonotary of a particular Court

The following actions and proceedings must be commenced within six years:

. . . .

(2) An action upon a contract, obligation or liability founded upon a bond, note or other instrument in writing, except an action subject to another limitation specified in this subchapter. Where an instrument is payable upon demand, the time within which an action or proceeding on it must be commenced shall be computed from the later of either demand or any payment of principal or of interest on the instrument.

42 Pa.Con.Stat.Ann. § 5527 (Purdon Supp. 1981). This statute only became effective June 27, 1978. However, its predecessor, Pa.Stat. Ann. tit. 12, §§ 31 & 36 (1953), also provided for a six year limitation on actions on promissory notes.

**6.** PHEAA's fears have been realized. Although Courts of Common Pleas have not been receptive to statute of limitations arguments by

defendants in PHEAA cases, *see, e. g., PHEAA v. Reid*, 102 Dauph. 130, 15 D. & C.3d 661 (Pa.C.P.1980), a recent decision of Commonwealth Court has altered the situation. In *Commonwealth v. J. W. Bishop & Co.*, —— Pa.Cmwlth. ——, 423 A.2d 773 (1980), the court held that Pennsylvania departments and agencies are no longer immune from the bar of the statute of limitations. Although that case involved a suit by the state Department of Transportation against parties causing damage to bridges by the use of overweight vehicles, the one Court of Common Pleas to consider the question has held that *Bishop* ends any immunity PHEAA enjoyed from the operation of such limitations. *PHEAA v. Xed*, 102 Dauph. 304 (Pa.C.P.1980). Although *Bishop* apparently is under appeal, *id.* at 305 n.5, for the present the doctrine embodied in the phrase "nullum tempus occurrit regi" is dead.

of Common Pleas.[7] Pa.R.Civ.P. 1007. Another form of action relied on by PHEAA is the entry of the borrower's confession of judgment pursuant to Pa.R.Civ.P. 2951. By such procedures, PHEAA instituted the actions in dispute in this case in the Court of Common Pleas of Dauphin County. In considering the validity of this choice, it is necessary to examine separately procedures pertinent to the two types of action.

## A. *Assumpsit*

Rule 1006 of the Pennsylvania Rules of Civil Procedure governs venue in assumpsit actions.[8] PHEAA has consistently maintained that venue is proper in the Court of Common Pleas of Dauphin County in accordance with Rule 1006(a) which provides for suit "only in a county ... where a transaction or occurrence took place out of which the cause of action arose ...." PHEAA's view is that because the Agency's internal procedures, the attendant paperwork, and its decision to guarantee the loan occurred in Dauphin County, a transaction out of which the cause of action arose had taken place there.

Several Pennsylvania courts have considered the venue issue, raised under Pa.R. Civ.P. 1006(e), but they have not all agreed as to the propriety of Dauphin County venue. The Pennsylvania Commonwealth

Court, a court of intermediate appellate jurisdiction, has held that a "transaction or occurrence" had taken place in Dauphin County, and thus venue was proper. *PHEAA v. Christon*, 42 Pa.Cmwlth. 165, 400 A.2d 1329 (1979). Crucial to that court's determination was its recognition of certain facts: (1) the debtor's original loan agreement was with both the lending institution and PHEAA; (2) the debtor knew PHEAA was the guarantor; and (3) the forms the debtor signed were supplied by PHEAA and co-signed by a PHEAA official. Because of PHEAA's substantial original involvement in the loan and because it was apparent from the forms and negotiations that PHEAA was based in Harrisburg in Dauphin County, the court held that venue in that county was proper.

In *PHEAA v. Devore*, 267 Pa.Super. 74, 406 A.2d 343 (1979), the Pennsylvania Superior Court, also an intermediate court of appeal, ruled that PHEAA could not sue Devore in Dauphin County because no "transaction or occurrence," Pa.R.Civ.P. 1006(a), transpired in Dauphin County. *Devore*, however, is of limited weight because it is based on the Pennsylvania court's belief that "Dauphin County has no relationship to the transaction [the formation or

**7.** In Pennsylvania, the Courts of Common Pleas are the courts of general, original jurisdiction. 42 Pa.Cons.Stat.Ann. § 931(a) (Purdon 1981) (superseding Pa.Stat.Ann. tit. 17, § 251 (Purdon 1962) (same)). There are fifty-nine Courts of Common Pleas, generally one for each county. 42 Pa.Cons.Stat.Ann. § 901 (Purdon 1981) (a few pairs of counties share single courts) (superseding Pa.Stat.Ann. tit. 17, § 221 (Purdon 1962) (one court for each county of the state)). Each Court of Common Pleas has a Prothonotary, 42 Pa.Con.Stat.Ann. § 2731 (Purdon 1981) (superseding Pa.Stat.Ann. tit. 16, §§ 401 & 3401) (Purdon 1956)).

**8.** Pertinent provisions of the rule provide:

(a) Except as otherwise provided by Subdivisions (b) and (c) of this rule, an action against an individual may be brought in and only in a county in which he may be served or in which the cause of action arose or where a transaction or occurrence took place out of which the cause of action arose or in any other county authorized by law.

. . . .

(d) For the convenience of parties and witnesses the court upon petition of any party may transfer an action to the appropriate court of any other county where the action could originally have been brought. It shall be the duty of the prothonotary of the court in which the action is pending to forward to the prothonotary of the county to which the action is transferred, certified copies of the docket entries, process, pleadings, depositions and other papers filed in the action. The costs and fees of the petition for transfer and the removal of the record shall be paid by the petitioner in the first instance to be taxable as costs in the case.

(e) Improper venue shall be raised by preliminary objection and if not so raised shall be waived. If a preliminary objection to venue is sustained and there is a county of proper venue within the State the action shall not be dismissed but shall be transferred to the appropriate court of that county. The costs and fees for transfer and removal of the record shall be paid by the plaintiff.

Pa.R.Civ.P. 1006.

breach of the contract for the loan] except that it is the location of the assignee." 267 Pa.Super. at 77, 406 A.2d at 344. Apparently, before the trial court, PHEAA presented itself as nothing more than the assignee of the note. The record of PHEAA's relationship with the debtor was less complete than the record in *Christon*. When PHEAA sought to introduce on appeal evidence of its "substantial role in the process of transacting this loan," the Superior Court refused to consider it. *Id.* at 77 n.3, 406 A.2d at 344 n.3.[9]

One state court has considered the question since *Devore* and *Christon*. In *PHEAA v. Barksdale*, No. 2666 S 1977 (Pa.C.P., Dauphin County 1980), the Court of Common Pleas followed *Christon*, finding venue in Dauphin County, and rejected *Devore* on the ground that the Superior Court improperly took jurisdiction of the appeal in that case. Regardless of the merits of the state appellate jurisdiction question, we believe that upon analysis of the statute and the body of Pennsylvania law pertaining to venue[10] the Pennsylvania Supreme Court would follow *Christon* and decide, especially when all relevant facts of the PHEAA guaranty are considered, that venue is proper in Dauphin County under Pa.R.Civ.P. 1006(a).

That conclusion, however, does not end the analysis of venue in assumpsit actions. *Devore*, *Christon*, and *Barksdale* addressed only one part of the state venue rule, the part defining the minimum requirements for venue. Not addressed was Pa.R.Civ.P. 1006(d), which permits a court to transfer an action on the petition of any party "[f]or the convenience of parties and witnesses."[11]

A court evaluating an objection to venue under Pa.R.Civ.P. 1006(a) may consider only the few factors deemed material in that section. But much broader concerns are appropriate when a court is analyzing a petition for change of venue under Rule 1006(d). This wider inquiry is appropriate in view of the difference in remedies available through the two avenues of relief from venue. If a Rule 1006(a) challenge is successful, the case cannot be retained by that court. Possibly, it may be transferred to an appropriate court, *see* Pa.R.Civ.P. 1006(e), but if no other venue is proper, the action must be dismissed. A Rule 1006(d) petition, however, urges only that, although the court then entertaining the action has proper venue, the case should be heard elsewhere because of other considerations. For

**9.** This court asked the parties to address whether this split between the Commonwealth and Superior Courts created an ambiguity in state law that would best be clarified by state courts. We inquired whether, in this situation, abstention would be appropriate. *See Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Because in reviewing the two opinions we conclude the Pennsylvania Supreme Court would follow the Commonwealth Court decision, we do not believe *Pullman* abstention would be appropriate. Supporting this conclusion is recognition of the limited effect abstention pending resolution of the *Devore-Christon* conflict would have on this litigation. *Devore* and *Christon* addressed only direct challenges to venue in Dauphin County based on arguments that Pa.R.Civ.P. 1006(a) was not satisfied. Although a Supreme Court decision following *Devore* might moot this challenge, one following *Christon* would only raise a new state question, whether indigent defendants could successfully move for a change of venue under Pa.R.Civ.P. 1006(d). Because a forum non conveniens determination under Rule 1006(d) necessarily rests on the facts of the particular case, abstention could

never serve to answer such a state question generally. Finally, even if *Pullman* abstention would result in a clarification of assumpsit venue rules, plaintiffs in this case who have not yet been sued and those brought into court by entries of confessions of judgment would have their claims delayed for a determination not material to their present situations. Thus, we believe, *Pullman* abstention is inappropriate.

**10.** *See Burdett Oxygen Co. v. I.R. Wolfe & Sons, Inc.*, 433 Pa. 291, 249 A.2d 299 (1969); *Craig v. W.J. Thiele & Sons, Inc.*, 395 Pa. 129, 149 A.2d 35 (1959); *County Constr. Co. v. Livengood Constr. Corp.*, 393 Pa. 39, 44, 142 A.2d 9, 13 (1958).

**11.** In *Barksdale*, the parties by stipulation reserved the Rule 1006(d) question. In *Devore* and *Christon*, there is no indication that the defendants in objecting to venue, asserted a forum non conveniens argument. Rather, in those cases the issue was the meaning of "transaction or occurrence," an absolute requirement under Rule 1006(a), not an element of a Rule 1006(d) inquiry.

a Rule 1006(d) petition to receive favorable treatment, it must appear that there is another court which can hear the case, and hear it more conveniently. Under such a test, there is no danger that the plaintiff's action will be dismissed, and so relief is granted more readily.

■ We believe that the facts of indigency and limits on ability to travel, as urged by plaintiffs in this case, would be relevant to a Rule 1006(d) petition, although it is plain that such circumstances are not material to a Rule 1006(a) determination of venue. Although Pennsylvania courts have declined to transfer cases solely on the ground that a certain venue is inconvenient to a defendant, *e. g., Proctor & Schwartz, Inc. v. Cleveland Lumber Co.*, 228 Pa.Super. 12, 323 A.2d 11 (1974); *Tarasi v. Settino*, 223 Pa.Super. 158, 298 A.2d 903 (1972), other courts, recognizing the practical problems of particular cases, have granted transfers. *E. g., National Label Co. v. Rapp*, 69 D. & C.2d 329, 331 (Pa.C.P., Phila.County 1974); *Leonard v. Troy Community Hospital*, 25 Bucks 335, 67 D. & C.2d 355 (Pa.C.P.1974).[12]

■ A Court of Common Pleas might well conclude that an indigent defendant, sued on a loan a substantial distance from his residence and intending to defend with witnesses residing in his local community, is entitled to a transfer. We do not know how the state courts would treat such a petition because even those plaintiffs in this case who have already been sued have *never petitioned* for a transfer under Rule 1006(d). Without attempting to predict how the state courts will handle the state cases, we conclude that in assumpsit actions

Rule 1006(d) at least offers a specific avenue for relief from the alleged hardship of a Dauphin County forum, even if Rule 1006(a) may not.

### B. *Confession of Judgment*

Pennsylvania's procedures governing confession of judgment for money due, Pa.R. Civ.P. 2950–2962, do not have a specific venue provision analogous to assumpsit's Rule 1006. However, the rule providing procedures to obtain relief from a judgment by confession, Pa.R.Civ.P. 2959, currently serves the purpose. Rule 2959,[13] in relevant part, provides:

(a) Relief from a judgment by confession shall be sought by petition. All grounds for relief, whether to strike off the judgment or to open it, must be asserted in a single petition. The petition may be filed in the county in which the judgment was originally entered, in any county to which the judgment has been transferred or in any other county in which the sheriff has received a writ of execution directed to him to enforce the judgment.

Under this rule, defendants have the option of challenging by petition the confession of judgment in several locations. Assuming that the debtor has property only in the county of his residence, before a plaintiff could execute on the judgment, the judgment would have to be transferred to the county of the debtor, or a writ of execution directed to the sheriff of that county. At such a time, the Court of Common Pleas of the debtor's home county would have venue of a petition from the debtor challenging the judgment. Thus, Rule 2959 appears to

---

12. Pennsylvania's law governing forum non conveniens changes of venue was amply surveyed in *Rini v. New York Central R.R.*, 429 Pa. 235, 240 A.2d 372 (1968).

13. The quoted passage reflects amendments effective in 1980. The prior version did not contain the venue directions:

(a) Relief from a judgment by confession shall be sought by petition. All grounds for relief whether to strike off the judgment or to open it must be asserted in a single petition. Pa.R.Civ.P. 2959(a) (Purdon 1975). Neither the trial court in this case, nor the parties, analyzed Pennsylvania law as to venue in confession of

judgment actions, an analysis we deem necessary. Given this omission and recognizing the purely academic nature that a discussion of the superseded rule would have, we believe it appropriate to consider only the current rule. One feature common to both rules should be noted, however: relief from a judgment by confession is available *only* by petition. Thus, regardless of venue, at this initial stage, the *only means of challenge, petition, is equally* available to all defendants, regardless of their location. *See* text accompanying notes 14 & 15 *infra.*

satisfy the objection of the federal plaintiffs in this case that confessing judgment in Dauphin County denies them due process. Before any injury will be sustained, the court in their home county will have obtained venue.

A second feature of Pennsylvania's confession of judgment rules, alluded to earlier, see note 13 supra, is relevant to our inquiry into the adequacy of Pennsylvania rules. Under both the present and prior Rule 2959(a), a defendant could strike off or open a confessed judgment only by filing a petition. Regardless of the location of the court or the financial status of the parties, only by submitting a legal instrument is relief available.[14] Pennsylvania's rules permit the use of the mails for both filing of such papers, Pa.R.Civ.P. 205.1, and service of such papers on opposing parties. Pa.R. Civ.P. 233. Thus, in regard to initial attempts to challenge a confession, venue is irrelevant: the required petition can be as easily mailed 200 miles as across the street. The indigent defendant living far distant from a Court of Common Pleas in which a plaintiff has sought to enter a confession of judgment has the same access to that court under Pennsylvania's rules as does a non-indigent defendant residing in the county in which the court is located.[15]

Keeping in mind these rules of civil procedure, we turn now to consideration of the district court's disposition of the various claims of plaintiffs and the arguments PHEAA has asserted on this appeal against those dispositions.

### III.

PHEAA first contends that the trial court should have abstained from deciding this due process claim, at least in so far as it is raised by the members of Class I, persons already sued by PHEAA in state court. The Agency maintains that under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and its progeny such abstention is required. The district court disagreed, holding that "[t]he doctrine of abstention is uniquely inappropriate in the case *sub judice* where the plaintiff class does not have access to the court which constitutes the state remedy." 497 F.Supp. at 724.

Were this court to agree with PHEAA, it would be extending the *Younger* doctrine to purely civil cases, an extension the Supreme Court has so far declined to take, *Juidice v. Vail*, 430 U.S. 327, 336 n.13, 97 S.Ct. 1211, 1218 n.13, 51 L.Ed.2d 376 (1977), at least expressly. *See id.* at 345 n.*, 97 S.Ct. at 1222 n.* (Brennan, J., dissenting) (suggesting that the majority had extended *Younger* to all civil litigation). Certainly such a decision would be extending the doctrine in this circuit. In *New Jersey Education Association v. Burke*, 579 F.2d 764 (3d Cir.), *cert. denied*, 439 U.S. 894, 99 S.Ct. 252, 58 L.Ed.2d 239 (1978), this court declined an invitation to abstain, reasoning that

> the statute at issue here is unrelated to the enforcement of the state's criminal laws; indeed, citizens rather than the government initiated action in the New Jersey state court. Neither the traditional equitable aversion toward intermeddling in criminal processes, nor the state's interest in enforcing its laws in its own forum is present.

*Id.* at 768 (footnote omitted). Although *Burke* may be distinguished from this case

---

**14.** There is no question that a party seeking relief "by petition" is expected to file a *written* document, not make an oral presentation. Pa.R.Civ.P. 207 requires that "[e]very petition shall be divided into paragraphs numbered consecutively, each containing as nearly as may be a single allegation of fact." Obviously, a written submission is necessary.

**15.** At trial the plaintiffs challenged generally the constitutionality of PHEAA's use of confession of judgment procedures. The district court refused to consider the argument, saying

it "should properly be raised as a defense" in the state action. 497 F.Supp. at 724. Plaintiffs have not appealed this ruling but we note that Pennsylvania's rules do not require a great showing to open a confessed judgment. "If evidence is produced which in a jury trial would require the issues to be submitted to the jury the court shall open the judgment." Pa.R. Civ.P. 2959(e). This evidence for the purpose of opening the judgment may be taken by *deposition* which may be taken *in the county where the debtor resides*. See Pa.R.Civ.P. 2959(e).

because there the association, not the state, brought the state court action, and here it is the state that sued, the disputes are analagous in that the state court action cannot be classified as quasi-criminal. Indeed, the court in *Burke* specifically rejected a contention that "the state's role in providing education ... furnishes justification for invoking the *Younger* bar." *Id.* at 768 n.21. This case is similar in that it concerns the state's role in financing higher education. Thus, for us to hold that *Younger* required the district court to abstain from hearing the claims of Class I would require us not only to broaden the reach of the doctrine, but also arguably to overrule prior circuit law.[16]

■ We conclude, however, that because of the peculiar nature of the constitutional claim of denial of access to courts, we need not decide whether *Younger* should be extended. If plaintiffs are correct that they have been denied access to state courts, then *Younger* abstention would be inappropriate, for they would have no opportunity to present their arguments in state court and thus would be without a remedy.[17] But if we were to hold that plaintiffs have not been denied access to court, then although *Younger* abstention might be appropriate, it would be an empty gesture because in deciding its appropriateness we would have necessarily decided the merits of the case. Having decided the merits, abstention could serve no purpose. Moreover, "we know enough about the way [the Pennsylvania] procedure is actually administered to form a reliable opinion about its validity ... [and] therefore, we have a duty to reach the merits." *Juidice v. Vail*, 430 U.S. at 341, 97 S.Ct. at 1220 (Stevens, J., concurring). We therefore cannot conclude that the district court committed reversible error in not abstaining and we similarly decline to abstain.

16. PHEAA does not and could not argue that *Younger* would prevent consideration of the claims of Class II, persons not yet sued by PHEAA.

17. The Supreme Court has held that *Younger* did not bar federal consideration of an issue "that could not be raised in defense of the [state] criminal prosecution." *Gerstein v.*

## IV.

Next PHEAA argues that the district court's due process analysis was flawed. That court looked to the due process test announced in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976):

> [I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903, *quoted in Little v. Streater*, —— U.S. ——, ——, 101 S.Ct. 2202, 2205, 68 L.Ed.2d 627 (1981) (access to courts case). To evaluate the district court's disposition of plaintiffs' due process claim, we must apply the *Mathews* balancing test to the facts of this case. In so doing, we keep in mind that plaintiffs' attack on the venue of the state actions brought against them challenges not only the policy decision of a state agency, from which they borrowed money, but also the state rules of civil procedure and jurisdiction that permit such a policy position.

### A. The Private Interest

■ The district court concluded that the private interest affected was substantial, but offered in support of that decision only the conclusory statement that "[t]he access of indigent defendants to the judicial process is at stake." 497 F.Supp. at 721. We

*Pugh*, 420 U.S. 103, 108 n.9, 95 S.Ct. 854, 860 n.9, 43 L.Ed.2d 54 (1975). *See Juidice v. Vail*, 430 U.S. 327, 337, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977) ("Here it is abundantly clear that appellees had an *opportunity* to present their federal claims in the state proceedings. No more is required to invoke *Younger* abstention.") (emphasis original) (footnote omitted).

disagree with both that statement and the finding of substantiality.

In considering this factor, the district court apparently decided that the general right of access to the courts was the private interest affected. The plaintiffs' claim, however, is only that they have been deprived of the ability to appear personally by the decision of PHEAA to sue them in Dauphin County, not locally. But as we have seen in our review of Pennsylvania procedures, these indigent defendants have several means of access to the judicial process. The federal plaintiffs sued in the state actions in assumpsit have available Pa.R. Civ.P. 1006(d), which permits forum non conveniens transfers—transfers that the plaintiffs admit would give them complete access to court, including local, personal presence. Further, a Rule 1006(d) motion, and indeed defenses generally, may be made by mail. Pa.R.Civ.P. 205.1. Similarly, those federal plaintiffs against whom PHEAA has entered confessions of judgment could file petitions requesting relief from the entry of judgment, or could await an attempt by PHEAA to execute, at which time venue would lie in the county of execution, probably the county of their residence. Pa.R.Civ.P. 2959(a). Petition is the only means to seek the opening of such a judgment, id., and as we have seen, the filing of a petition does not require personal appearance before the court. See text accompanying notes 14 & 15 supra. Thus, the district court erred in holding that the private interest affected was a general right of access to the courts.

Possibly, however, the private interest of plaintiffs allegedly affected is narrower. They might argue that they have an interest in personally appearing in a local court. We find no cases recognizing any general right to appear personally in local courts and reject any contention that such an interest is substantial. Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), the case on which plaintiffs and the district court have so heavily relied, gives no credence to a claim that such an interest is substantial. There, the indigents were denied access to all Connecticut state courts, such courts being the only forum in which to obtain a divorce. Here, the indigents admittedly are in court. Their claim is only that it is so far away as to prevent them from presenting a defense. Given the availability of certain Pennsylvania procedures that dispense with the requirement of personal appearance and others that permit transfers when personal appearance is important, we decline to find a substantial interest in being able always to present a defense in a local court.

Finally, a private interest of a monetary nature might be alleged. Arguably, the indigency of plaintiffs might someday end and PHEAA would then be able to collect sums due it on the purchased loans in default.[18] If they suffered a financial loss without being permitted any kind of access to the courts, a substantial private interest could be affected. See Lecates v. Justice of the Peace Court No. 4, 637 F.2d 898, 907–09 & n.16 (3d Cir. 1980). But, here plaintiffs do not assert such an interest. The due process claim they have made does not depend on PHEAA's ultimate execution of a judgment against them. Although a monetary deprivation may be a substantial private interest, we do not find such an interest in this case. In sum, the private interests presented in this case are insubstantial and this factor weighs against a conclusion that due process has been denied.

### B.  The Risk and Probable Value

The district court also found a high risk of erroneous deprivation of a substantial private interest and great value in the "safeguards" it ordered. 497 F.Supp. at 721–22. We disagree. As is apparent from the discussion in the preceding section and from our earlier analysis of Pennsylvania

---

**18.** Indeed, the indigency of Greeley already appears to be on the wane. In her May 11, 1979 deposition, Greeley revealed that she had borrowed approximately $400 from the Thorpe Finance Co. in August 1978 to purchase furniture and had been regularly making payments of $36 per month on that loan since then. The PHEAA loan to Greeley required monthly payments of $31.14, yet she never made a single payment.

procedures, the risk of a deprivation of general access to courts is non-existent, even assuming that such a deprivation would always be erroneous. The risk of a loss of the "right" always to appear personally in a local court is real, but we have already found such an interest to be totally without substance. Finally, the case presents no evidence of risk of an erroneous monetary deprivation. Thus, our analysis of the risk factor also suggests that there has been no denial of due process.

Moreover, we see little value in the substitute procedure ordered by the trial court which requires the transfer of all PHEAA cases against indigents to courts in the counties in which they reside. On the other hand, we perceive that such a procedure may have a serious potential for disruption of the carefully structured Pennsylvania Rules of Civil Procedure on venue. We have already seen how individual indigents desiring such transfers and showing reasons in support of their desires can petition for such changes. Also, we have seen that under Pennsylvania procedure personal appearance is not necessary. For the indigents facing suit by PHEAA, the district court's relief then may be unnecessary, even if it is desired.

In addition, there appear to be already state procedures providing alternatives to the defense of these state suits with or without personal appearance. For instance, disputes involving amounts below certain maximums, depending on local court rule and state law, may be subject to compulsory arbitration. 42 Pa.Cons.Stat.Ann. § 7361 (Supp.1981). Even if these state actions do not fall within the compulsory arbitration provision, they are within the purview of the section governing "[v]oluntary arbitration of pending judicial matters." *Id.* § 7362.[19] PHEAA might well agree to arbitration of disputes, as it is empowered to do, *id.* § 7362(b), and such arbitration could be held in the county of the debtor.

Extrajudicial alternatives also are possible. As we recognized earlier, PHEAA has displayed great willingness to adjust payment schedules or temporarily defer payments altogether if a defendant evinced the slightest sincere interest in meeting the debt. If these federal plaintiffs made even occasional payments, there would be no statute of limitations problem, and legal action might be indefinitely stayed. Given the availability of such alternatives, the probable value of the district court's order in remedying the alleged deprivation is minimal. Our evaluation of this factor also indicates that due process has not been denied.

### C. The Government's Interest

Although the interest of Pennsylvania and particularly PHEAA in bringing these state actions in Dauphin County may not be strong, we do not believe, as the district court did, that it is "negligible." 497 F.Supp. at 722. There was little evidence either way on the fiscal cost of bringing suit in plaintiffs' home counties, but PHEAA did show that there were administrative advantages in relying on the Dauphin County court rather than the courts in 67 separate counties in Pennsylvania. The major one is that PHEAA is familiar with the local procedures of Dauphin County and that the local court is familiar with the operation of PHEAA. Were the district court's order extended to the entire state, PHEAA would be confronted with a multitude of sets of rules and perhaps the need to engage separate counsel in each county, and an equally large number of courts would have to become familiar with the operation of PHEAA. Such an administrative burden would necessarily have a fiscal component. At any rate, we conclude that the Government's interest is not negligible.

In light of our analysis of the varying factors, their balancing is simple. None of

---

**19.** Section 7362 provides, in pertinent part:

(a) General rule.—A civil matter or issue therein may be referred by consent of the parties to one or more appointive judicial officers or other persons for hearing or hearing and disposition.

(b) Government units.—Any government unit of this Commonwealth, with the consent of the solicitor or other official counsel of the unit, may agree to the reference of a civil matter pursuant to this section.

the factors support plaintiffs' contention or the district court's conclusion that PHEAA's decision to file suits in Dauphin County has denied these plaintiffs due process. The decision of the district court on the due process claim must be reversed.

## V.

A brief review of the major cases concerning access to courts supports our view that there has been no denial of due process.

In *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), the Court held that Connecticut denied due process to indigents by charging non-waivable fees totalling $75 as prerequisites to filing divorce actions. In that case plaintiffs had made complete use of the available state procedures and had no alternatives. They had filed divorce papers, albeit without the fees, and had had them returned. *Id.* at 373, 91 S.Ct. at 783. Further, "[s]ubsequent efforts to obtain a judicial waiver of the fee requirement and to have the court effect service of process were to no avail." *Id.* Plaintiffs there, unlike those here, were totally excluded from court. Also, it was plain that there was no substitute for a state-sanctioned divorce. *Id.* at 376–77, 91 S.Ct. at 785–86.

Similarly, in the recent case of *Little v. Streater*, —— U.S. ——, 101 S.Ct. 2202, 68 L.Ed.2d 627 (1981), a deprivation of access to courts was found in Connecticut's charging of a non-waivable fee for paternity tests. The tests were crucial because, under Connecticut procedure, without such corroborating evidence a defendant's denials were, as a matter of law, insufficient defense in a paternity action. *Id.* at ——,

101 S.Ct. at 2207. In *Little*, the federal plaintiff had, as a defendant in state court, asserted indigency and sought state payment of the cost of the tests. *Id.* at ——, 101 S.Ct. at 2204. The state refused and the tests were never given because of "financial reasons." *Id.* Not surprisingly, his defense thus failed. Without paying those costs, the state defendant was foreclosed from presenting a successful defense. As we have seen, this case is different.[20]

Finally, in *United States v. Kras*, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), the Supreme Court held that an indigent was not denied due process when prevented from filing a petition for voluntary bankruptcy for his failure to pay a $50 filing fee. The Court in *Kras* found no great hardship in a denial of a discharge to the indigent party. "Gaining or not gaining a discharge will effect no change with respect to basic necessities." 409 U.S. at 445, 93 S.Ct. at 638. The legal action by PHEAA does no more. Moreover, the *Kras* Court concluded that "the Government's control over the establishment, enforcement, or dissolution of debts [is not] nearly so exclusive as Connecticut's control over the marriage relationship in *Boddie*." *Id.* In that case, as in this dispute, alternatives exist, both under state rules and through negotiation of a private arrangement with PHEAA.[21]

## VI.

Plaintiffs also argue that the district court's decision on PHEAA's choice of a forum may be upheld under Pennsylvania's Unfair Trade Practices and Consumer Protection Law, Pa.Stat.Ann. tit. 73, §§ 201–1

---

**20.** In both *Boddie* and *Little*, the Supreme Court emphasized that not only money was at stake. The adjudications, divorce and paternity, determined familial relationships and thus affected fundamental interests. *Boddie*, 401 U.S. at 376–77, 91 S.Ct. at 785–86; *Little*, —— U.S. at ——, 101 S.Ct. at 2209. *See also United States v. Kras*, 409 U.S. 434, 443–45, 93 S.Ct. 631, 636–38, 34 L.Ed.2d 626 (1973). Such interests are not implicated in the dispute now before this court. *But cf. Lecates v. Justice of the Peace Court No. 4*, 637 F.2d 898, 907–09 &

n.16 (3d Cir. 1980) (civil defendant facing $1500 judgment like plaintiff seeking divorce in *Boddie*).

**21.** In *Kras*, the Court noted that the filing fee could be paid in small installments. 409 U.S. at 449, 93 S.Ct. at 640. It is undisputed that PHEAA attempts to negotiate repayment schedules, allowing terms and rates more convenient than those ordinarily offered by private lending institutions.

—201–9.2 (Purdon Supp.1981).[22] The district court rejected this claim, holding that the state law was intended "to prevent conduct the nature of which can be generally characterized as fraudulent or deceptive" and that PHEAA's actions were not fraudulent or deceptive. 497 F.Supp. at 723. The court therefore denied relief under the Pennsylvania law. Plaintiffs maintain that the district court erred in requiring a showing of fraud or deception. Defendants, although agreeing with the reasoning of the district court, argue that this court need not and should not reach the merits of this issue because plaintiffs failed to cross appeal from the district court's decision.[23]

The Supreme Court has steadfastly held that the failure of a party to raise an issue by way of cross appeal does not automatically preclude an appellate court from considering the issue. But the failure of a party to appeal will prevent the review of certain issues. The rule as to when an appellate court will consider a claim, even though not raised by appeal, was announced by a unanimous Court in *United States v. American Railway Express Co.*, 265 U.S. 425, 435, 44 S.Ct. 560, 564, 68 L.Ed. 1087 (1924):

> It is true that a party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter

not dealt with below. But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.

(Footnote omitted.) This rule, now long recognized as "inveterate and certain," *Morley Construction Co. v. Maryland Casualty Co.*, 300 U.S. 185, 191, 57 S.Ct. 325, 327, 81 L.Ed. 593 (1937), continues to guide courts. *Massachusetts Mutual Life Insurance Co. v. Ludwig*, 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976); *Dandridge v. Williams*, 397 U.S. 471, 475 n.6, 90 S.Ct. 1153, 1156 n.6, 25 L.Ed.2d 491 (1970); *Reserve Insurance Co. v. Brokerage Surplus Corp.*, 570 F.2d 487, 491 (3d Cir. 1978). *But see* Stern, *When to Cross-Appeal or Cross-Petition—Certainty or Confusion*, 87 Harv. L.Rev. 763 (1974). *See generally* 9 Moore's Federal Practice ¶ 204.11[3] (2d ed. 1980).

If the federal plaintiffs (appellees), by their argument that the district court erred on the merits of the Unfair Trade Practices claim, seek only to enforce the decree granted, this court may consider their contentions. But if a finding for appellees on this claim would necessarily enlarge the relief, we may not and should not consider it. Because we believe a finding for plaintiffs on this state claim must perforce expand the scope of the decree, we decline to hear the merits of this claim, absent an appeal.

Although plaintiffs maintain that a decision for them on the Unfair Trade Practices claim only supports the decree, if the dis-

---

**22.** Indeed, they argue that this court should consider this asserted statutory basis for the district court's order before reaching the constitutional question. As they note, a decision should be based on state law grounds if it avoids the necessity of deciding the case on constitutional grounds. *Siler v. Louisville & Nashville R. R.*, 213 U.S. 175, 191–93, 29 S.Ct. 451, 454–56, 53 L.Ed. 753 (1909); *Mahone v. Waddle*, 564 F.2d 1018, 1025–26 (3d Cir. 1977); *Gagliardi v. Flint*, 564 F.2d 112, 116 (3d Cir. 1977). Our consideration of the constitutional claim, *supra*, is correct in light of our disposition of this claim.

**23.** At trial, plaintiffs urged two other grounds for relief. First, they claimed that they were entitled to relief under 42 U.S.C. § 1983 (1976) based on PHEAA's alleged commission of the Pennsylvania tort of abuse of process. Second, they asserted an implied cause of action under the Higher Education Resources and Assistance Act of 1965, 20 U.S.C. §§ 1078(b) & (c) & 1078–1(b)(1) (1976 & Supp. III 1979). The district court rejected these contentions and plaintiffs neither appealed those rejections nor addressed them in their briefs or argument to this court. Therefore, we decline to review those decisions.

trict court had found for plaintiffs under the Act it would have been required to grant broader relief. The Unfair Trade Practices Act specifically provides for private actions:

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money . . . as a result of the use or employment by any person of a method, act or practice declared unlawful by section [201–3 of this title], may bring a private action, to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper.

Pa.Stat.Ann. tit. 73, § 201–9.2(a) (Purdon Supp.1981).[24] Under this provision, it is apparent, a plaintiff presenting a meritorious claim under the Act is entitled as a matter of law to "actual damages or one hundred dollars ($100) whichever is greater." *Id.* Although a court has discretion under the Act to treble damages or to "provide such additional relief as it deems necessary or proper," *id.*, the legislature, by directing in the sentence describing discretionary relief that "not less than one hundred dollars ($100)" shall be awarded, *id.*, has made clear that the minimum statutory damages are not discretionary. Thus, if plaintiffs had prevailed on their claim under the Act, each individual plaintiff would have been entitled to a minimum of $100 damages. Similarly, if this court were to reverse the district court on its disposition of that claim, we believe the individual plaintiffs would be entitled to damages. But the district court's decree, from which plaintiffs have not appealed, awarded no damages. Therefore, a reversal on the Unfair Trade Practices claim would necessarily enlarge the scope of relief and expand the decree.

Although in their argument to this court plaintiffs have not asked for damages in asserting the Unfair Trade Practices Law as a basis for affirmance, we do not believe that the right to damages under the Act is or can be waived if a violation is found. Certainly, we do not believe that we could hold that the district court erred in denying the Unfair Trade Practices claim, but rule that plaintiffs were not eligible to recover these damages. We shall not rely on a statute to affirm a decree while denying to a party the relief directed by that statute. Moreover, Item G of the prayer of relief in the complaint filed September 1, 1978, asked the court to "[a]ward each of the Plaintiffs statutory damages against Defendant, P.H. E.A.A., as provided by the Pennsylvania Unfair Trade Practices Act." This relief was denied when the district court held that PHEAA did not violate the Unfair Trade Practices Law. If the district court erred, the plaintiffs are entitled to the damages they sought. But they did not appeal. They cannot now rely on the Act only in support of the decree issued, but not for the mandatory damages they originally sought under the Act. We hold that failure of plaintiffs to appeal precludes our consideration of this claim. Accordingly, we decline to address its merits and leave intact the district court's decision on this claim for want of a properly presented appeal.

### VII.

In its Order of May 25, 1980, the district court enjoined defendants "from collecting any monies for attorneys' fees from defaulting student debtors unless specifically authorized by the loan agreement." Plaintiffs had complained that defendants, in some of the actions filed in state court against student debtors in default, had sought attorney's fees, even though the loan agreements sued on did not specifically provide for such fees.[25] Collection of fees

---

24. Several other provisions of the Act provide for enforcement by the Pennsylvania Attorney General or Local District Attorneys. Pa.Stat. Ann. tit. 73, §§ 201–3.1, 201–4, 201–5, 201–8 & 201–9 (Purdon Supp.1981).

25. Promissory note forms distributed by PHEAA beginning in August 1978 and identi-

in such a case, plaintiffs contended and defendants agreed, would violate established state rules on the award of attorney's fees.[26] *See Chatham Communications, Inc. v. General Press Corp.,* 463 Pa. 292, 300–01, 344 A.2d 837, 842 (1975); *Corace v. Balint,* 418 Pa. 262, 270–75, 210 A.2d 882, 886–89 (1965). Although PHEAA admitted that it asked for the award of fees in cases in which such an award would be improper, it contended that because it had discontinued and had promised not to resume making such requests without contractual authorization, no injunction should issue. The district court ruled instead that "[t]o insure fruition of PHEAA's good intentions, the Court will nonetheless enter an injunction prohibiting the collection of attorneys' fees except where specifically authorized by the loan agreement." 497 F.Supp. at 720.

PHEAA raises two arguments in support of its contention that the injunction was improper. First, they contend that the attorney's fees controversy was mooted by discontinuance of the practice of requesting fees and its promise not to recommence the practice. Second, they argue that the district court's order was an abuse of discretion because it improperly interfered with the functioning of the state courts. Although we cannot agree that the issue is moot, we do believe the district court abused its discretion in issuing this injunction.

Until February 5, 1979, PHEAA had included in all complaints it filed against debtors in default a request for payment of reasonable attorney's fees, even when such fees were not contractually authorized. A few complaints, prepared before February 5, 1979, and containing such requests despite lack of authorization, were filed after that date, but apparently no baseless requests were filed after April 1, 1979, or more than a year before the district court's final decision and order. Thus, the allegedly offending activity of PHEAA had not recurred for a substantial period of time prior to the injunction. Further, PHEAA agreed not to return to the policy of requesting attorney's fees unless authorized. On this basis, PHEAA argues that the fees issue is moot. This is not enough. "[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i. e., does not make the case moot." *United States v. W. T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), *quoted in County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). But a case becomes moot if "(1) it can be said with assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur, . . . and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Marshall v. Whittaker Corp., Berwick Forge & Fabricating Co.,* 610 F.2d 1141, 1145 n.9 (3d Cir. 1979) (quoting *County of Los Angeles v. Davis,* 440 U.S. at 631, 99 S.Ct. at 1383). As the Court stated in *W. T. Grant Co.,* to make such a demonstration the defendant must carry a "heavy" burden. 345 U.S. at 633, 73 S.Ct. at 897. We do not believe that PHEAA has shouldered it.

Even though PHEAA apparently has not filed a complaint requesting fees, except where specifically authorized, since April 1, 1979, and even though the Agency maintains that it does not intend to resume such requests, it is not certain that changes in state leadership or philosophy might not result in reinstitution of the policy.

fied by plaintiffs as "currently in use" at the time of trial contain the following authorization for collection of attorney's fees:

In the event I/we fail to repay the principal and interest of this loan or any portion thereof when due and payable, and such loan is repaid to the Lending Institution by PHEAA under its loan guaranty, I/we agree to pay, in addition to principal and interest and late charges any expenses necessary for collection, including reasonable attorney's fees and collection fees, not to exceed 33⅓% of the total sum due and payable.

**26.** Plaintiffs have not asserted that the request for or collection of attorneys' fees in the absence of statutory or contractual authorization would amount to a constitutional deprivation. This then is a purely pendent state claim.

Present intentions may not be carried out, and, at any rate, they are not controlling on the issue of mootness: *Id.* at 633, 73 S.Ct. at 897. *See Ammond v. McGahn,* 532 F.2d 325, 328 (3d Cir. 1976).

Further, because there remain outstanding complaints in which PHEAA requested attorney's fees despite the absence of contractual authorization, this injunction, arguably, limits future actions by PHEAA. Assuming that a defendant in one of PHEAA's state cases agreed to settle the claim including attorney's fees or did not challenge such fees at trial, and the state court approved a settlement or awarded damages that included fees, the injunction would still preclude PHEAA from collecting those fees. This issue is not moot.

■ This court may set aside an injunction, however, if it constitutes an abuse of discretion. We find such abuse here. Although PHEAA, in its complaints in the state actions, had repeatedly asked for payment of attorney's fees, to which it was not entitled under state law, it does not automatically follow that a federal court should issue an injunction affecting the way parties conduct themselves in state litigation. First, there was and is no indication that PHEAA ever erroneously collected fees. Second, such a lack of evidence suggests either that PHEAA has been correcting the errors or that the Pennsylvania courts have vigilantly refused to grant such fees. Third, since the allegedly offensive requests for fees are made only once state litigation has commenced, state defendants have an immediate forum in which to contest the claims.

Parties to litigation often make claims in their complaints or pleadings that, on examination, lack substance. The function of courts is to separate the meritorious claims from the hollow. Indeed, there is every indication that the Pennsylvania courts have performed this task well in these PHEAA cases. It is more than presumptuous for a federal court to issue an order directing PHEAA in the conduct of its state litigation to remove from the Pennsylvania courts the opportunity to decide a relatively simple matter of Pennsylvania law. This is an extreme, because it is ongoing, example of unnecessary federal intrusion into the operation of a state's court system. Much less intrusive intervention was found improper in *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977). Because we are not convinced, as the district court apparently was, that Pennsylvania courts cannot decide when awards of attorney's fees are proper, we must hold that the district court abused its discretion in enjoining the collection of attorney's fees except under specified conditions.

### VIII.

For the foregoing reasons, the judgment of the district court will be reversed and the case remanded with instructions to dissolve the injunctions and dismiss the action.

Each side to bear its own costs.